**GODFATHER, INC., Relator,**

v.

**The CITY OF BLOOMINGTON, Respondent.**

No. C4–85–831.

Court of Appeals of Minnesota.

Oct. 15, 1985.

Review Denied Dec. 13, 1985.

Gerald M. Singer, Meshbesher, Singer & Spence, Minneapolis, for relator.

David R. Ornstein, Bloomington City Hall, Bloomington, for respondent.

Considered and decided by POPOVICH, C.J., and WOZNIAK and HUSPENI, JJ., with oral argument waived.

## OPINION

POPOVICH, Chief Judge.

Appellant Godfather, Inc. seeks review of a liquor license denial by the Bloomington City Council. Appellant contends (1) the council acted arbitrarily and capriciously, and (2) the licensing process was procedurally irregular because a police investigation report was sent to the city council. We affirm.

## FACTS

Godfather, Inc., a Minnesota corporation proposing to operate Vino's Italian Cuisine, applied for an on-sale intoxicating liquor license with the City of Bloomington. John Anzevino, Jr., the sole shareholder of the corporation, would be the facility's manager. The city conducted a lengthy investigation, culminating in a police report filed by its chief of police. The city manager also issued a report recommending denial. The parties agreed to a fact-finding hearing which was held before an administrative law judge from the State Office of Administrative Hearings. The administrative law judge issued findings of fact and conclusions of law but because of the submission for the limited purpose of fact-finding did not weigh the importance the city might assign one fact or another, and issued no recommendation whether the license should be granted. The findings and conclusions are highly detailed and referenced.

Anzevino, 47 years old, has been affiliated with liquor establishments all his life. From 1972 to June 1976 he was a one-third owner and manager of the Park Terrace Supper Club (a.k.a. Duff's in the Park). In 1977 he became the owner and manager of the Godfather Restaurant in Richfield, which closed on December 31, 1984 because of condemnation proceedings for a large urban renewal project. Connected with the Godfather was the Speakeasy Bar. The Speakeasy Bar had a separate entrance from the restaurant and catered to a young, rowdy, destructive, over-drinking clientele. In June 1980 a fight erupted between two motorcycle gangs, resulting in a shooting. The use of drugs, particularly marijuana, occurred at times with the knowledge of bartenders, waitresses and hostesses. By 1984, most of the problems

associated with the Speakeasy Bar had noticeably diminished.

In November 1981 a corporation controlled by Anzevino was granted a liquor license by the City of Medicine Lake to operate Vino's Godfather, II. In seeking approval, Anzevino told the Medicine Lake City Council he would have a restaurant serving gourmet Italian food upstairs and a workingman's bar downstairs. The Godfather II lost money and closed down a year later. It reopened in November 1982 under a format called the "III G's: Games, Girls, Guys, Fun and Food," featuring topless female and male dancers. Prior to opening the new format, Anzevino was requested by city officials to keep the original format but would only do so if the city underwrote his losses. On November 8 the Medicine Lake City Council passed a public nudity ordinance effective November 25, 1982. Following citations, Anzevino sued in federal court to have the ordinance declared unconstitutional. The city later agreed not to enforce the citations until it passed a constitutional ordinance, which it did on December 24, 1982. Anzevino closed the Medicine Lake operation around January 12, 1983.

The administrative law hearing disclosed that many persons working at Anzevino's Richfield operation did not have federal, state, and social security taxes withheld. This reduced the employer's share of unemployment compensation contributions.

In addition, on the license application Anzevino was required to supply, he was asked, "Do you have any contingent liabilities? Legal claims? Are you a defendant in any suits or legal actions?" Anzevino answered, "No" or "None" to these questions.

In fact, Anzevino personally was the subject of many legal claims involving his personal guarantee on behalf of a corporation known as "Arrive Alive." There were also outstanding dram shop suits pending against Godfather, Inc.

Neither Anzevino nor any establishment he owned or managed was ever convicted of a violation of any liquor ordinance or statute.

The city council, at its regular meeting on February 11, 1985, held a public hearing and denied the application because Anzevino lacked "good moral character" in that: (1) applicant failed to withhold state and federal income tax and pay social security and unemployment compensation for a number of employees; and due to this failure, he was under investigation by local, state and federal authorities; (2) applicant failed in preventing others from using drugs in the Speakeasy Bar; (3) applicant failed to disclose on his liquor application that he was a defendant in a number of lawsuits; and (4) applicant refused to cooperate with the City of Medicine Lake by operating a topless dancing show in his establishment.

## ISSUES

1. Did the Bloomington City Council act arbitrarily and capriciously in denying Anzevino's application for a liquor license?

2. Was the licensing process procedurally infirm?

## ANALYSIS

1. Minn.Stat. § 340.13, subd. 12 (1984) and Bloomington City Code § 13.29(2) prohibit the issuance of a liquor license to a person not of "good moral character." The city council rejected Anzevino's application for a license on that basis.

> [A] city council is vested with broad discretion in determining whether or not to issue or renew a [liquor] license, and a court's scope of review of such a determination is a narrow one, which should be exercised most cautiously. * * * Nevertheless * * * the licensing authorities must not act arbitrarily or capriciously and "[c]ourts will interfere to prevent an abuse of discretionary power; and will grant relief from unreasonable, arbitrary, capricious, or fraudulent action of municipal authorities."

*Wajda v. City of Minneapolis*, 310 Minn. 339, 343, 246 N.W.2d 455, 457 (1976) quot-

ing 2 *E. McQuillan, Municipal Corporations* § 10.37 (3d ed. 1979).

■ We cannot say the council's decision to deny Anzevino a license was arbitrary or capricious. The administrative law judge's findings and conclusions, clearly supported by the evidence, indicated Anzevino (1) improperly failed to withhold federal ·and state income taxes for some employees and failed to withhold and forward social security contributions, (2) Anzevino's employees, including managerial employees, failed to follow management's written procedures in connection with the open use of marijuana at the Speakeasy Bar, (3) Anzevino failed to cooperate with the City of Medicine Lake in connection with the nude dancing at the Medicine Lake facility, and (4) Anzevino failed to disclose contingent liabilities and pending litigation in which he and his corporation were defendants.

■ While we agree with Anzevino that the record does not show he intentionally violated the withholding laws, the other areas of concern to the council are legitimate and reflect an absence of arbitrariness. The council is entitled to consider the misconduct associated with the Speakeasy Bar while Anzevino was the owner. The responsibility for its operations rested with Anzevino. The council could consider his record in dealing with drug usage, underage drinking, assaults, and other incidents which relate to his fitness and character to hold a liquor license.

Anzevino does not dispute the administrative law judge's conclusion he did not cooperate with the Medicine Lake officials regarding the nude dancing, but argues the episode should not have been given much weight. We do not know how much impact it had on the council, but the city has a legitimate interest in determining a liquor license applicant's cooperation or lack of cooperation with city officials.

The record fully supports the council's concerns over Anzevino's failure to disclose contingent liabilities with his application. He denied he had any claims or he was a defendant in any pending suit. The record showed he was a defendant in several pending suits. The city was justifiably concerned about his honesty.

■ 2. Anzevino also argues the licensing procedure was unfair because a police report submitted to the city council before the hearing contained many allegations and accusations which were later dropped as a possible basis to deny or approve the application. As a result of the report, the city council referred the matter to an independent hearing examiner. *See Miller v. City of Saint Paul*, 363 N.W.2d 806, 813 (Minn. Ct.App.1985), *pet. for rev. denied*, (Minn. Apr. 26, 1985). The administrative law judge's report clearly stated that extraneous matters were not litigated and would not be an appropriate basis for license denial. The council's decision to deny the license was confined to the matters litigated which could properly be a basis to deny the license. Anzevino claims he was damaged by the "muckraking" in the police report. There is no evidence the council considered improper factors.

### DECISION

The record supports the Bloomington City Council's denial of a liquor license. It did not act arbitrarily or capriciously in denying the liquor license because of a lack of good moral character. The license process was not handled improperly.

Affirmed.